Last case this afternoon is number 2430723 Williams v. City of Baton Rouge Good afternoon, Your Honors. Good afternoon. On behalf of Plaintiff and Appellant Archie Williams, if it would please the Court, I'd like to reserve five minutes of my time. Sure. So where do we start with? And I think the most logical thing has to do with the undisputed fact that in this case, this incredibly tragic case, we have a man that did 36 years and change for a crime that he was factually innocent of. That is undisputed. He positively could not have committed this crime. In fact, while he was in custody, they discovered the identity of the person that actually did commit the crime. So when we look at how this happened, what we've done is we've analyzed in chronological order how this type of thing happened. And our primary argument, Your Honors, has to do with the undisputed facts that over a two-day period, this extremely vulnerable witness and victim was shown three photographic line-ups, each of which included Mr. Williams' face with five completely distinct individuals. It may seem like it would be common sense, but this repeated suspect effect is the type of thing that can create a substantial likelihood of misidentification. That is well documented in the case law. But I do have one major problem with being able to prove this, is that prior to the events in question, which happened in 1982 and 1983, there had not been a case, published or otherwise, in which this exact thing happened, in which a witness was shown over a two-day period, three consecutive line-ups involving the same person. Now, my esteemed opposing counsel have seized upon this fact, and they've said that we have not submitted a case with substantial authority as to put them on notice, put the Baton Rouge defendants on notice, that we had a constitutional problem here. And along those lines, while I must concede that, I don't believe that that lack of a similar case or a fundamentally similar fact pattern would foreclose our 14th Amendment claim. And the reason is quite simple. Almost all of the qualified immunity analysis that has happened, both in this circuit and the Supreme Court case, that has focused on cases being similar, have involved Fourth Amendment cases that involve excessive force. I believe the quote that I seized upon is, in Mullinex v. Luna, the court talks about the fact that this is most prominent in Fourth Amendment cases. And it would stand to reason that a police shooting or a police pursuit or some application of force that happens during a Fourth Amendment 1983 action is going to necessarily be rapidly evolving, and it's going to be fact-specific. When we talk about the 14th Amendment, however, these are more, these are entrenched principles. When we talk about, for example, the prohibitions against not disclosing exculpatory evidence, or as here, the likelihood of a misidentification. These are 14th Amendment claims, and by their nature, they are not the same types of analysis that's going to be involved in a Fourth Amendment claim. Practically every opinion that talks about qualified immunity, I actually jotted them down. Mullinex v. Luna, shooting. Plumhoff v. Rickard, shooting. Rousseau v. Haugen, shooting. Barnes v. Felix, shooting. Kissela v. Hughes, shooting. Scott v. Harris, Fourth Amendment case involving a vehicle. White v. Pauley, shooting. Anderson v. Creighton, Fourth Amendment warrantless search. These aren't 14th Amendment cases. Let me ask you a question. I thought that Ms. Eaton, the victim, identified Mr. Williams in part because of the scar on his right arm. I thought that was crucial in her view. With regard to the scar, it was not the same scar. Well, obviously it wasn't, since they found someone else who did it, but he did have some kind of noticeable scar. Mr. Williams had some kind of scar on his right arm. And when we look at the prominence of that fact, we also have to look at the fact that Stephanie Alexander, who was present, said that Mr. Williams was not the person. She identified a person who was 5'9", slim build. However, when we start talking about the scar, what we have to do is, we don't have pictures of that scar. We have to take counsel's word for it that it was the same. However, when we're talking about a case this old, and we start talking about the identifications that were made of this individual, are we really able to distance ourselves from how she got there in the first place? Well, let's be a little more precise. Which defendants are you saying violated her constitutional rights? I'm saying specifically, with regard to Baton Rouge, Defendants Marjorie Grote, Charles Mondrick, and Stephen Miller. I'm sorry, Stephen Woodring. Pardon me? Okay. Were those the forensic people or the suggestive lineup police people? Those are the suggestive lineup police people. But I didn't want to drop your point without thoroughly addressing it, Your Honor. Okay. I think it's a very important point. So, does this case not go to a jury, simply because there's an identification of a scar without a description of it? Without a description as to how that scar may or may not be similar to a scar that Mr. Williams actually had? And is that fact, standing alone, enough to completely insulate all of the defendants from liability in this case? And I would respectfully submit to all of you that she's not going to be identifying the scar, or any other component thereof, if she has not first been conditioned to believe that this particular person is the person that committed these horrific acts against her. How does Mr. Williams get arrested in the first place? We know he didn't do it. He gets arrested, not because of a scar. Well, there's a confidential informant, evidently. Yes. Confidential informant said that he might have had something to do with it, but it wasn't the CI that gave them probable cause. It was victim Eaton. And when we start thinking about that, the reason why I go back in time to this arrest, and the fact that it was set in motion by this wrong identification, I think that when we start talking about the grant of qualified immunity, what we're saying is that a jury doesn't get to decide this. This doesn't even get to go before a jury. All of the cases that have talked about identification, whether it be Manson v. Braithwaite, Neal v. Biggers, Simmons v. United States, they say it's the totality of circumstances. This is not something that can be made with one fact isolated from the rest of the facts. And another thing that occurred to me, Your Honors, is that this is an old case. It's old because the events happened in 1982 and 1983. So the fact that this was such a severe prison sentence for a crime that he didn't commit actually prejudices Mr. Williams because we're limited to the body of case law that existed before he first got arrested. So he's got this hurdle to find a similar case, but because he was in prison for so long, he has to find a similar case that happened a long time ago. You see, no one's ever going to bring a police shooting to you based on events that happened in the 80s. The Fourth Amendment claims by their definition, regardless of the gridlock in courts, they're going to happen within five years or so. This is further evidence of the fact that I don't think our high court requires that same level of specificity with regard to a Fourteenth Amendment claim. These are more well-established claims. They are solid claims. So when we turn to the heart of your argument, are you asking us to conclude that qualified immunity is inapplicable to a Fourteenth Amendment claim as you have so eloquently and passionately argued it? Absolutely not. But what I am saying is that it should not have the same notice requirement that would be attendant to a Fourth Amendment claim. That's all I'm saying. And I'm saying that if you have a generalized, well, let me go back. Our Supreme Court has had a problem with Tennessee v. Garner in shooting cases because they've said it's too general. Tennessee v. Garner simply says very generally you can't shoot an unarmed person running away. But that's not enough according to our high court. In a situation where I'm saying we have three photographic lineups occurring over two days, with the same person coming up again and again in all three, that is a textbook example of the repeated suspect effect. I shouldn't have to find that same thing happening before 1982. I should simply be able to rely on the generalized statement which holds that this pretrial identification procedure cannot be so unnecessarily suggestive as to create the risk of misidentification. And we know there was a misidentification here. So what I'm posing to you as high court judges is to consider this onerous requirement of finding a similar case. Every case that has that, look at the cases. They're Fourth Amendment cases. Almost never do they arise under the Fourth Amendment. Now finally, briefly, I'd like to say something about the bloody photograph. We have in the factual record photographs for you to look at. This is such an old case that we don't have digital images of what it is that the jury saw. But there's a big difference between a print that is lifted, a so-called latent print, and a print that is visible to the naked eye. There's a factual dispute as to where in the residence this bloody print photograph that we're fighting about was taken. I have citations in my brief to the deposition of Pat Lane, who said that he doesn't know where it came from. It was not in the photographs that were shown to the jury. It was not consistent with the latent prints that were shown to the jury. So does this present a Brady problem? When we're talking about a situation where there's very little physical evidence, in fact, there's no physical evidence connecting this man to the crime, how are they going to pin it on him? How are they going to get this on him? The fact that there is a photograph of a cherry red bloody print that does not match up with any of the physical characteristics that are in any of the other photographs is incredibly significant in my mind, because it shows that that photograph was taken from an area of the residence that is not the area that has been determined to be the area where this crime occurred. Now, those are my primary points. If the court has any questions, I would defer the majority of my time. Well, I would just say you're correct that with respect to most all 1983 claims, they are arising out of some kind of alleged police misconduct. And within qualified immunity, we've got clearly established law you've got to find, right? But in a case that came from here, in which our court said no relief, no similar case, no none of that. Ramos, I think is the name of it. Ramos. The Supreme Court says, nope, this is just so bad, you don't need a prior case. They said it's clear and it's obvious. My question to you is, in this context, are you saying this is such a case that should be outside the ambit of clearly established law because of what happened here? And if you are saying that, then what and how are you articulating it with respect to these forensic defendants? And I think the court is seizing on a very important distinction. No, that's why I asked it. If I got nothing at all, okay, nothing, I would come to you and I'm going to say, this is so bad that you should find this to be the first case, okay? But I'm not that far off here. So I don't think you need to employ that analysis. I think the analysis is more akin to one that would fit under the rubric of the generalized statement that a pretrial identification procedure should not be so unnecessarily suggestive. It's fact specific. And the only thing I have to say about that is, and you have a chance for rebuttal, but the district court said the lineups were not impermissibly suggestive according to the Supreme Court law at the time. Well, with regard to that particular point, I think that the court erred in that regard, in taking it away from the jury. But I'll have more on that later. All right, sir. Thank you. Thank you. Mr. Shillage. May it please the Court. Good afternoon, Your Honor. Michael Shillage on behalf of the City of Baton Rouge, Parish of East Baton Rouge, and the three BRPD officers in this case, which are Alfred Charles Mondrick, Marjorie Grote, and Steve Woodring. And Your Honors, for the sake of procedural posture, I'll be tendering the second half of the 20 minutes to my co-counsel, who represents the state defendants. Yes, sir. The appellees here, in this case, Your Honors, simply request that we apply the law as written and do not create new law that does not exist. We go straight to the qualified immunity analysis in the Simmons case. In that case, we had police officers take six family photo collections of the same two suspects repeatedly. And unlike this case, it was not over a two-day period with three different lineups. It was six consecutive photographs of the same people. And in that case, the Supreme Court said under the circumstances of that lineup, that process of investigation, it was not going to reach the level where it's not impermissibly suggestive because of circumstances unique to that investigation. And that's it. This is not an objective ability to just scrutinize math on the number of lineups or the people involved in the lineups. You have to look at the totality of circumstances. That's one circumstance where the opposing counsel and I do agree. So in this case, we look at ROA 9,675 to 9,679. And that's where the victim testified about the scar. And as telling as that was in the trial, there's something even more important in the ROAs or in the lineups. We heard the officers explain, and this is at pages 11,768 to 11,771 and 11,908 to 11,910. These officers had never had a victim request the side profile style photo. Now, in the briefs, but not argued here today, it was suggested that the BRPD officers were not trained in how to do photo lineups. But these ROA citations are indicative of not only the application correctly of what's impermissibly suggestive, but also that they had great acumen in a time when these were new evolutions in a less evolved technological world. They were trained. Because what they did with the circumstances when the victim asked, this is the man, but I want to see the side of his face. Because whenever I was raped, I saw the side of his face a lot. So what should the officers have done? What would a reasonable officer in the same circumstances, because we're talking about qualified immunity, what would all reasonable officers do? No, ma'am, sorry, just give us yes or no so we can go home. No, they went another step further, and they did not just bring one photo of a profile of that suspect who had been identified, particularly by the victim. They went and compiled an additional six-pack with five other profile photos of five other individuals that fit the criteria to ensure in their understanding of what a photo lineup should be, to make sure it's not impermissibly suggestive. They weighed and balanced what was right for their case at that time, and that is policing. There's no rule book on this. They made a choice, and they tried to do it as fairly based on their experience and what the case was showing. Charles Mondrick said it in his deposition. He said, we were leading where she was taking us. There's another argument in the brief that wasn't raised today that called where the victim identified two other individuals. That's not accurate. They had a characteristic, a nose, lips, ear, one singular characteristic of the face. It wasn't until she identified Mr. Williams that she said the person, the whole, matches. That's an important fact unique to this case. The question was posed, Judge Stewart, by you about whether or not this Fourth and Fourteenth Amendment analysis can be different under the context of qualified immunity. No, not substantively. Sure, the first prong of qualified immunity is different when you're talking about what is the clearly established right. Well, it's not excessive force or false arrest under Fourth Amendment, right? It would be, in this case, a due process right under the Fourteenth Amendment. However, the right changes that, but the analysis remains the same. What was the established right at the time? That his photo can't be used in a lineup? That it can't be used once, twice, three times, a hundred times? There's no objective rule on that. It's what's impermissibly suggestive. That, I acknowledge, we all have that right, not to have our photo used in impermissibly suggestive. They would take a photo and they would dim the photo to change the skin tone of the individual. That's found to be impermissibly suggestive. We have situations where individuals are told inferentially or verbally by officers. You sure it's not this one right here? Things nothing in the record to that extent. In fact, at ROA 9,675 to 9,679, I'm sorry, I apologize for giving you the wrong, I've already given you that citation, 4,263 to 4,265, Ms. Eaton's trial testimony, even you can read the angst and frustration in her testimony that the BRPD officer said nothing to her other than the base instruction of, these are the photos for you to look at, let us know if you find someone who you identify. That was it, but that's in the record. Those are facts. That's important for the analysis of this case. No one did anything improper. No one inferred or gave information to suggest otherwise, and Ms. Eaton gave direct testimony to confirm that, and that's why the proffered expert of Gary Wells, it had no relevance or materiality to the summary judgment because he gave an opinion that was conclusory and not only unsupported by the facts, it was contradicted by the facts of the case. So, for that reason, the rights clearly established only if there is an impermissibly suggestive line of, that was not shown in this case, and even if you could get past that first prong, go to the second prong, what evidence has been shown that any officer would have disagreed with what these officers did to try to help the victim and find a perpetrator? It's a tough job, and when there wasn't DNA, these were the mechanisms that were available, and they used them. The sentence courts even said, we're not going to eliminate the photo lineup process, as flawed as it is, right, because it's been acknowledged that there was flaw in it from the beginning, but when you have nothing else to go off of, something that can be subject to cross-examination and scrutinized equally among all parties, that's better than nothing. Now, I'm sorry, I know I'm running down on my time. If there's any questions, I'll be happy to entertain them. I don't think so, Mr. Schlage. Thank you. Thank you, Your Honors. I got your name right, Mr. LeBlanc. Thank you, Your Honor. You've probably heard it before. I have. Good afternoon, Your Honors, esteemed counsel. May it please the Court, I represent three civil servants that worked for the Louisiana State Crime Lab. First was Sybil Guidry. She was a late-in-print examiner. Pat Lane, he was a forensic scientist, and Jerry Miller, who was a lab technician. As to Sybil Guidry, originally, she was part of the focus on this side of the case. We'll call that on the forensic side. The original focus was she should be held liable in this horrible circumstance because she did not perform an analysis that was unknown to science for 19 years further. Once we elucidated those facts, that claim went away. There was no appeal on her. She is dismissed. I raise her as an abundance of caution. He was not mentioned by Mr. Dunn up front. Then the ire, the focus of the case, shifted to Pat Lane. This individual was a forensic scientist. If you look in the record, his affidavit begins at 10911. His affidavit is uncontradicted. He was called in early on to take crime scene photographs and to do lists at the scene. He did his job diligently. And the irony of all these accusations raised against Mr. Lane is it was his diligent work that ultimately led to the exoneration of Mr. Williams years later. He went and lifted everything he could, whether he could identify it or not. These are days where the movie The Usual Suspects, the only lifts you could compare were the lifts that you knew somebody around. You knew a suspect. You knew things. There wasn't a national database. It wasn't until the AFIS system, the IAFIS system that came years later. And when they first tested the system, the prints taken by Mr. Lane did not have a match. It was 10 years later when it had a match and exonerated him. But Mr. Lane's involvement was done very quickly. And at that point, he had no idea of any potential suspect. Didn't know race, sex, gender, other than the broadest of things. There has been a claim that he suppressed one crime scene photograph. That claim was made very early on. We did extensive discovery. That claim was false. His affidavit is uncontradicted. What he did is, as he always does, uniformly as he's trained, takes the crime scene photographs. At that point in the training, the protocol, it would go out to a third-party processor, Cadare's was the name, the local processor. Get that and put them into the secure box that only very few people have access. Sometimes the prosecution will get the photographs when he's not there. Other people are there. Sometimes the defense will want the photographs. It'll go through these other people. He had no control of them. He took all the crime scene photographs and put all of them in the box. And whether it's in, from whenever cameras were invented till now, there's never been any clearly established rule that that's wrong. It's not even possible. He did what he was trained to do. He doesn't call through them or sift through them. So I guess, broad strokes, there is no suppression by Lane. Lane's diligent effort is what ultimately exonerated, thank goodness, Mr. Williams. The other problem with the claim is, the photographs were either in the possession of the defense counsel, but they were certainly in the possession of prosecution. What was not known at the time, the suit went in alleged fraud on behalf of everybody, is that the photographs were offered. We've given you the citation to the hearing transcript where Judge Ponder, it's at 10656-10657, where Judge Ponder says, have you seen the photographs, the crime scene photographs? The defense says, no, we'd like to see them, we haven't asked for them. Prosecution said, you can have them, all you have to do, they're here. And he says, come back to us if you don't have them. Mr. Lane, he's been out of this for nine months, ten months. At that point, he doesn't roll in any of that. He put it in the box. He did what he was supposed to do. None of this has any relevancy to Mr. Lane, but we wanted to bring those facts there. So either, if somehow, Mr. Williams' defense counsel didn't go request all the crime scene photographs, we can't control that. I think he probably did, because several of the photographs were offered at trial. No one objected, they were offered without objection, they were asked questions about. My guess is, his criminal defense attorney said he didn't want one more bloody picture. Probably thought, why would I try to inflame him further? That's probably what happened. But here's where we go next. So the photograph was not suppressed by Lane, freely available to defense, maybe in the possession of defense. If it was in their possession, it was because they didn't ask for it. But what we know is that it was not exculpatory. It was redundant to everything there. What has not been told, she was not referenced, is up front. This photograph, it's 10.5, it's called in this litigation. It shows where many of the key lift evidence was taken and discussed at trial. All the merits of everything is on that photograph. To the left side of that photograph is all the lift evidence. To the right side is something that was called the blob. Up front, that was, well, there's bloody smear there and maybe that was relevant. We went in to post, their expert, our expert testified, two world class expert testified that there's no meaningful evidence on that side. There's nothing new. We've shown the court that the jury was fully aware of bloody print evidence that didn't match to Archie Williams. It would have been cumulative at best and redundant. Both experts agree. Ron Smith, world class palm evidence. Our expert, world class Glenn Langenberg. Both say there was no meaningful evidence. The relevant evidence on photograph 10.5 was presented in far superior fashion through the lift evidence like S12. The jury had it. The jury knew about print evidence, not talked to them. So photograph 10.5 was cumulative and inferior. The district court did an excellent job of showing what really happened. It's a truly unfortunate circumstance. You had compelling witness by a very credible victim that did her best. She said she studied his face. She said she didn't think she'd live to see it, but if she did, she wanted to do a good composite so she could bring him to justice. She described the scar. Judge Ponder asked him to lift his sleeve and there's a scar right there. And the third issue was the alibi witness was impeached. My client said nothing to do with that. Finally, I'm going to address one last thing and then I'll move on. This claim now that photograph 10.5 somehow addresses another room. When at first it was photograph 10.5 is relevant because my expert is going to look at it and tell us it's relevant. When the expert says it's not relevant, it's of no value. Well now we'll forget that, forget all the representations I made to the district court. We've outlined those all in our brief. And now it's that counsel can look at these and ignore the two world-class experts and what they've already represented to the court and say, oh, well, I can look at that photograph. Forget these experts. I can look at the photograph and it's got something relevant in there. The jury already knew. A bloody prince not identified to Mr. Williams. But I will point out very quickly in the record that the assailant was only in one room, right? The room where all those lists were taken, where photograph 10.5 was taken, and the prints that exonerated Mr. Williams were taken by Pat Lane in that room, bedroom number two. So this speculation theory could never have been relevant, could never have been material. I have one minute left. I'd like to briefly address, Mr. Dunn did not mention Jerry Miller. There were two issues there. The percentage evidence, first all its testimony, which is subject to absolute immunity under BRSCO. Two, Jerry Miller gave more favorable testimony than additional testimony would have been. In other words, further testimony would have been more damaging to Mr. Williams than it was. Brady can never be premised upon giving testimony that's more favorable to the suspect than otherwise. And finally, the last thing is the idea, should he have done more testing? Well, under German, O'Keeffe, Beavers and all the cases, this guy, Mr. Miller, not even trained as a serologist, he's a zoologist, he's just looking, and nobody asked him to do this testing. He's not sure he'd even learn to do this testing. But there's no duty to test. So there can't be any clearly established rule. That's very clear in the record. I'm done unless the Court has any questions. No, sir. Thank you. Thank you. All righty, Mr. Dunn, rebuttal. So with regard to the case that counsel cited, and apparently the district court relied upon, Simmons v. the United States, that was a case involving a bank robbery, and following the bank robbery, officers obtained photographs of the suspects with others, and they were and they showed those photographs to the five employees separately, and they all identified the suspects. That is not what happened here. What happened here was we had a victim of an entirely different category of crime, a violent rape and attempted murder, who was shown six separate photographic lineups, which included Mr. Williams and 15 other people, but he was recurring in all three of them. The district court did not evaluate a fact pattern that was remotely akin to that. And as we all know, you look at this de novo, so you're not bound by the analysis. All we are saying here is that it should have gone to the jury, based on the totality of circumstances. If you have a situation where the same witness is being shown the same photograph over a two-day period three times, that is a fact question. Now, the idea of the expert witness Wells, Mr. Wells is a doctor, he's well-recognized, his CV is in the record. The fact that he has said that this is the worst case he's ever seen may mean nothing to defendants. It may mean nothing to a jury, but it does not mean that it does not establish genuine issues of fact here. The only thing I can do with a 40-year-old case, really, is have an expert and say, what do you see that's a problem here? The fact that we don't have case support to the contrary, that swings in favor of the non-moving party. All inferences must be granted in favor of the non-moving party. Now, as it relates to Mr. Lane, I point you to his deposition testimony, where I showed him that photograph, and he said it does not correspond to any of the latent prints that were lifted, and he says that the non-moving party is not in favor of the non-moving party. Molding in that photo does not correspond to any of the areas where he lifted a print from. I would invite the court to look at that picture and simply look at it. You don't have to be an expert and measure it against the pictures that were taken there. You will see that it is taken from an area that is totally different, I guarantee you. But when we're talking about a case that is of this magnitude, it seems as though it may be easy to lose sight of the fact that all inferences must be made in favor of the non-moving party. The cases that were relied upon by the district court and cited by counsel aren't anything close to what we have here. It's your call as judges to rationalize how could we say that if we have an impermissibly suggestive identification procedure that it doesn't matter if there is a scar in the wrongfully prosecuted person that's in the same general vicinity of the body. It's not like she said he's got a scar right here on his shoulder. If you look at what Mr. Williams showed on his body and what the witness identified, again, thirty-seven years, thirty-six years and change for a crime you didn't commit. Why did this not happen? There are so many irregularities here. You have to ask yourself, did we have enough to go to a jury? I think that that's abundantly clear here. We have a situation where the same victim was shown the same picture. Now, does that give rise to a failure to train claim? It absolutely does. And it appears as though we're caught in this catch-22. The district court will hold, I can't give a Monell claim because there's no underlying constitutional violation. And I have no underlying constitutional violation because I don't have a similar case. This keeps the merits of his claim from being heard. It's just the physics of it keeps the merits from being heard. And as we all know, Monell is not subject to qualified immunity. And I'm looking at zeros. All right. I can't thank you enough, Your Honors. We have your case. Thank you very much. Court will be in recess until nine o'clock tomorrow morning.